## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| SHANNON RIVENBARK and KAYLAH CASUCCIO, Individually and on behalf of all others similarly situated, | § § § § | |
| PLAINTIFFS, | § § | Civ. Action No. 4:17-cv-03786 |
| v. | § § § | |
| JPMORGAN CHASE & CO., | § § § | |
| DEFENDANT. | § | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' OPPOSED MOTION FOR AND BRIEF IN SUPPORT OF CONDITIONAL CERTIFICATION AND NOTICE TO PUTATIVE CLASS MEMBERS

Dated: June 8, 2018

Respectfully submitted,

*/s/ Stefanie R. Moll*
Stefanie R. Moll (Attorney-in-Charge)
TX Bar No. 24002870
Fed ID No. 22861
stefanie.moll@morganlewis.com
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T: 713.890.5000
F: 713.890.5001

OF COUNSEL:

Carrie A. Gonell (admitted *pro hac vice*)
CA Bar No. 257163
carrie.gonell@morganlewis.comMORGAN,
LEWIS & BOCKIUS LLP
600 Blvd., Suite 1800
Costa Mesa, California 92626
T: 714.830.0600
F: 714.830.0700

ATTORNEYS FOR DEFENDANT
JPMORGAN CHASE & CO.

T. Cullen Wallace
TX Bar No. 24072412
Fed ID No. 1383060
cullen.wallace@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX  77002
T:  713.890.5000
F:  713.890.5001

Aimee M. Raimer
TX Bar No. 24081275
Fed ID No. 24081275
aimee.raimer@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, TX  75201
T:  214.466.4000
F:  214.466.4001

# TABLE OF CONTENTS

**Page**

DATED: JUNE 8, 2018 ................................................................................................ 1

I.      INTRODUCTION ............................................................................................... 1

II.     PROCEDURAL SUMMARY ............................................................................ 4

III.    ISSUES PRESENTED ........................................................................................ 4

IV.     BACKGROUND ................................................................................................ 5

        A.     Chase Operates Call Centers Across the Country, and They Conduct
               Different Business Operations Under Varying Circumstances With
               Uniquely Tailored Practices, Polices, and Procedures ............................. 5

        B.     Chase's Uniform Pay Policy Mandates That All "Call Center Employees"
               Record and Are Paid For Log In Time ..................................................... 6

        C.     The Vast Majority of the Call Center Employees Signed Binding
               Arbitration Agreements That Prohibit Them From Participating In This
               Case ....................................................................................................... 7

        D.     Only Six Opt-in Plaintiffs Have Potential Claims In This Case ............... 8

V.      ARGUMENT ...................................................................................................... 8

        A.     Given The Meaningful Standard For Conditional Certification, Numerous
               Courts Have Denied Certification Where, As Here, Individualized Issues
               Would Dominate The Litigation ............................................................... 8

        B.     The Only Relevant Policy Directs Employees To Record Their Log-In
               Time. ..................................................................................................... 11

               Areas of Variation ................................................................................. 13

        C.     Call Center Employees' Job Duties, Computer Log-In Processes, and
               Directives From Managers Are Varied and Will Require Individualized
               Inquiries ............................................................................................... 15

               3.     Plaintiffs' Cited Authority Does Not Support Conditional
                      Certification In This Case ........................................................... 21

        C.     Alternatively, the Court Should Authorize Notice to Only Putative Class
               Members Who Worked in the FHC at the Katy Call Center ................... 23

        D.     The Court Should Not Authorize Notice to Putative Collective Class
               Members Who Signed a BAA and, Thus, Cannot Participate In This
               Action ................................................................................................... 26

               1.     The Supreme Court's Holding In Epic Sys. ................................ 27

               2.     The Employees And Chase Agreed To Delegate The Exclusive
                      Right To Determine The Enforceability Of The BAA To An
                      Arbitrator .................................................................................. 28

**TABLE OF CONTENTS**
(continued)

**Page**

|  |  | 3. | BAA Signers Are Not Similarly Situated To Each Other ....................... 28 |
| VI. | OBJECTIONS TO PROPOSED NOTICE ....................................................... 29 |
| VII. | CONCLUSION............................................................................................ 31 |

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adami v. Cardo Windows, Inc.*,
  299 F.R.D. 68 (D.N.J. 2014)...................................................................................29

*In re Am. Family Mut. Ins. Co. Overtime Pay Litig.*,
  MDL Docket No. 1743, 2009 WL 248677 (D. Colo. Feb. 3, 2009).........................33

*Anderson v. Wells Fargo Fin., Inc.*,
  No. 4:11-cv-00085, 2012 WL 12871958 (S.D. Iowa Feb. 6, 2012) .......................17

*Basco v. Wal-Mart Stores, Inc.*,
  No. CIV.A. 00-3184, 2004 WL 1497709 (E.D. La. July 2, 2004) ..........................12

*Botello v. COI Telecom LLC*,
  2010 WL 5464824 (W.D. Tex. Dec. 30, 2010) ......................................................29

*Brooks v. Bellsouth Telecomm., Inc.*,
  No. 1:07-CV-3054-ODE, 2009 WL 10699685 (N.D. Ga. February 10, 2009) .....................13

*Burch v. Qwest Comm. Int'l Inc.*,
  500 F. Supp. 2d 1181 (D. Minn. 2007).................................................................25

*Caballero v. Kelly Servs., Inc.*,
  No. CV H-14-1828, 2015 WL 12732863 (S.D. Tex. Oct. 5, 2015)...................12, 24

*Carey v. 24 Hour Fitness USA, Inc.*,
  No. 2012 WL 4857562 (S.D. Tex. Oct. 11, 2012)..................................................16

*Clay v. Huntington Ingalls Inc.*,
  No. 09-7625, 2011 WL 13205917, . (E.D. La. Sept. 29, 2011)........................12, 13

*Davida v. Newpark Drilling Fluids, LLC*,
  SA-14-CA-552-HJB, 2015 WL 13652730 (W.D. Tex. Jan. 6, 2015) .....................33

*Davis v. Mostyn Law Firm, P.C.*,
  No. 4:11-CV-02874, 2012 WL 163941 (S.D. Tex. Jan. 19, 2012).........................32

*Delgado v. Ortho-McNeil, Inc.*,
  No. SACV07-263CJCMLGX, 2007 WL 2847238 (C.D. Cal. Aug. 7, 2007) .......................33

*Epic Syst. Corp. v. Lewis*,
  2018 WL 2292444 (2018)..........................................................................6, 29, 30, 32

*Falcon v. Starbucks Corp.*,
  580 F. Supp. 2d 528 (S.D. Tex. 2008) ....................................................25

*Fasanelli v. Heartland Brewery, Inc.*,
  516 F. Supp. 2d 317 (S.D.N.Y. 2007).......................................................33

*Fischer v. Kmart Corp.*,
  No. CIV. 13-4116, 2014 WL 3817368 (D.N.J. Aug. 4, 2014) .............................29

*Fischer v. Mich. Bell Tele. Co.*,
  665 F. Supp. 2d 819 (E.D. Mich. Oct. 22, 2009)........................................25

*Griffith v. Wells Fargo Bank, N.A.*,
  No. 4:11-CV-1440, 2012 WL 3985093 (S.D. Tex. Sept. 12, 2012)........................17

*Hart v. JPMorgan Chase Bank, N.A.*,
  No. 8:12-cv-00470-T-27TBM, 2012 WL 6196035 (M.D. Fla. Dec. 12, 2012) ..............4, 8, 13

*Hawkins v. Alorica, Inc.*,
  287 F.R.D. 431 (S.D. Ind. 2012)........................................................14, 25

*Hens v. ClientLogic Operating Corp.*,
  No. 05-CV-381S, 2006 WL 2795620 (W.D.N.Y. Sept. 26, 2006)..........................33

*Hudgins v. Total Quality Logistics, LLC*,
  No. 16 C 7331, 2017 WL 514191 (N.D. Ill. Feb. 8, 2017).............................31

*Kucher v. Domino's Pizza, Inc.*,
  No. 16-cv-2492, 2017 WL 2987214 (S.D.N.Y. Feb. 13, 2017) ..........................25

*Lewis v. Huntington Nat. Bank*,
  No. 11-0058, 2011 WL 8960489 (S.D. Ohio June 20, 2011)............................33

*Long v. BDP Intern., Inc.*,
  No. 4:12-1446, 2013 WL 505232 (S.D. Tex. Feb. 8, 2013)............................24

*Medina v. Alicia's Mexican Grille Inc.*,
  2016 WL 3226170 (S.D. Tex. June 13, 2016).........................................30

*Morangelli v. Chemed Corp.*,
  2010 U.S. Dist. LEXIS 146149 (E.D.N.Y. June 17, 2010) ............................31

*Novick v. Shipcom Wireless, Inc.*,
  No. 4:16-CV-0730, 2017 WL 1344961 (S.D. Tex. April 12, 2017).....................12

*Odem v. Centex Homes*,
  2010 WL 424216 (N.D. Tex. Feb. 4, 2010)..........................................29

*Reyna v. Int'l Bank of Commerce*,
　　893 F.3d 373 (5th Cir. 2016) ..............................................................................31

*Richardson v. Wells Fargo Bank, N.A.*,
　　No. 4:11-CV-00738, 2012 WL 334038 (S.D. Tex. Feb. 2, 2012) .....................13, 25

*Ridley v. Regency Vill., Inc.*,
　　No. CV H-17-974, 2018 WL 1334813 (S.D. Tex. Mar. 15, 2018).........................33

*Russell v. Il. Bell Tel. Co.*,
　　575 F. Supp. 2d 930 (N.D. Ill. 2008) .....................................................................26

*Shajan v. Barolo, Ltd.*,
　　No. 10-1385, 2010 WL 2218095 (S.D.N.Y. June 2, 2010) .....................................33

*Sharer v. Tandberg, Inc.*,
　　No. 1:06CV626 JCC, 2006 WL 2988104 (E.D. Va. Oct. 17, 2006) ........................33

*Simmons v. T-Mobile USA, Inc.*,
　　No. H-06-1820, 2007 WL 210008 (S.D. Tex. Jan. 24, 2007)............................12, 17

*Thomas v. Huntleigh USA Corp.*,
　　No. H-16-3648, 2018 WL 560403 (S.D. Tex. Jan. 25, 2018)..................................12

*Villarreal v. St. Luke's Episcopal Hosp.*,
　　751 F. Supp. 2d 902 (S.D. Tex. 2010) .....................................................................27

*Ware v. T-Mobile USA*,
　　828 F. Supp. 2d 948 (M.D. Tenn. 2011).................................................................26

*In re Wells Fargo Wage & Hour Employment Practices Litig. (No. III)*,
　　No. 11-2266, 2013 WL 2180014 (S.D. Tex. May 17, 2013)............................32, 33

*Willis v. Behar*,
　　No. 4:13-cv-3375, 2014 WL 12741911 (S.D. Tex. Dec. 12, 2014) ........................19

**Statutes**

29 U.S.C. § 216.............................................................................................................27

Arbitration Act ..............................................................................................................30

Fair Labor Standards Act ................................................................................................4

FLSA..................................................................................................................... *passim*

## I.   INTRODUCTION

This is no ordinary motion for notice under the Fair Labor Standards Act ("FLSA"). Another federal court has already denied notice to a significantly more limited Chase call center population than Plaintiffs seek to conditionally certify here. *Hart v. JPMorgan Chase Bank, N.A.*, No. 8:12-cv-00470-T-27TBM, 2012 WL 6196035 (M.D. Fla. Dec. 12, 2012)[1] (denying conditional certification given the "existence of varying factual circumstances" among the putative class members, including "geography, line of business, supervisors, and managers").   Plaintiffs in this case have expanded the unsuccessful notice bid in *Hart* more than ten-fold, alleging that notice should issue to each of the *more than 21,000 current employees and scores of former employees* working in JPMorgan Chase Bank, N.A. ("Chase") call centers nationwide.   Plaintiffs allege that each of these thousands of individuals was expected to arrive prior to their shift and log into their computers and phones off-the-clock so that they could be "call ready" at their scheduled start time because Chase measured their adherence to their schedule.

Plaintiffs' request to send nationwide notice fails for at least two reasons.   First, the only uniform timekeeping policy covering these employees expressly requires them to be paid for log-in time: "Logging into or out of phone systems, computer networks or desktop applications" is a "work-related activity" that "must be recorded" in the timekeeping system.   Numerous call center employees attested that they have never been instructed to be call-ready at the start of their shift and have been paid for all computer log-in time.

Second, the evidence before this Court demonstrates that Plaintiffs are not similarly situated to other call center employees with respect to, among other things, their job duties, arrival

---

[1]     Unpublished cases attached at App. 1.

1

times, log-in practices, and manager expectations.   To adjudicate Plaintiffs' claims, this Court would need to individually assess, *inter alia*:

- **Whether an employee is expected to be "call-ready" at the start of her shift.** For example, opt-in Plaintiff Denise Gunnoe admitted that employees in her own section who reported to other managers regularly did not log in early (in contrast to what she allegedly did).  Many other employees attested that they were not expected to perform any work-related tasks – including logging into their phone and computer – prior to their scheduled start time, and that they were compensated for time spent performing all of their start-up tasks.  *See also* H. Cruz App. 2 ¶ 4 ("My supervisor has never told me that I need to come to work prior to my shift start time."); Perez App. 3 ¶¶ 3–4 (starts taking calls whenever her computer programs load after shift starts); Bokowy App. 4 ¶ 3 (built in grace period at the beginning of her shift in which she was not expected to be taking calls).

- **Whether an employee records and is paid for login time, regardless of when it occurs.** *See, e.g.*, J. Cruz App. 5 ¶ 7 ("I have always been paid for all hours that I work, including the time I spend logging into my computer at the beginning of the day."); Johnston App. 6 ¶ 3; Polly App. 7 ¶ 3; Perez App. 3 ¶ 3; Fuster App. 8 ¶ 5; Sillah App. 9 ¶ 4; Macioce-Carver ¶ 4; Blevins App. 11 ¶ 6; Rubenstein App. 12¶ 4; Benjamin App. 13 ¶ 5; H. Cruz App. 2 ¶ 5; Guerra App. 14 ¶ 4; *see also* Smith App. 15 ¶ 4 (arrives and logs in to computer pre-shift and gets paid for log in time).

- **Whether and to what extent an employee takes inbound calls.**  Plaintiffs argue that all employees working at call centers spend their time almost exclusively on inbound calls.  In reality, a number of call center employees spend significant amounts of time on other duties.  Thus, even if Chase required employees to be call-ready at their shift start as part of any adherence requirement – *it does not* – Plaintiff's theory of the case would still not extend to employees who, for example, spend their time emailing customers or reviewing documents.  *See, e.g.*, Fuentes App. 16 ¶ 2 (most of day is email correspondence with mortgage customers); Robinson App. 17 ¶ 2 (researches fraudulent transactions; "I spend very little time on the phone.").

- **Whether an employee arrives at work early enough to perform pre-shift work or, like many employees, arrives just at -- or even *after* -- her start time.** *See, e.g.*, Day Dep. App. at 18 41:9-14 (late once a week due to childcare issues); Polly App. 7¶ 2; Morgan App. 19 ¶ 2; Reyna App. 20 ¶ 2 (arrived right at shift start time).

- **For those employees who do arrive early, whether they spend their pre-shift time on non-working activities like eating breakfast, getting coffee, or talking with coworkers.** *See, e.g.* Rubenstein App. 12 ¶ 4 (drop off personal belongings, chat with coworkers and use the restroom); Sillah App. 9 ¶ 4 (coffee).

- **Whether an employee's log in time is *de minimis* under the FLSA.** *Compare* Rivenbark Dec. App. 21 at 83:18-84:3 (15-30 minutes) *with, e.g.*, Macioce-Carver App. 10

¶ 4 (1-2 minutes); J. Cruz App. 5 ¶ 5 (2-3 minutes); Reyna App. 20 ¶ 3 (same); Guerra App. 14 ¶ 4 (same).

- **Whether an employee is expressly trained and directed to record computer log-in time.** *See, e.g.,* Fuster App. 8 ¶ 3 ("The trainer instructed us that we get paid for any time spent on the computer and must record that time.").

Named Plaintiff Shannon Rivenbark admits that call center employees who did not perform any work before their shift start time, and/or who recorded their log in time and were paid for that time, would be "entirely different" from her. The evidence before this Court demonstrates that this putative collective action is filled with employees who are "entirely different" from Rivenbark. Plaintiffs include all of the normal arguments about the permissive standard for conditional certification, but this case is a prime example of why there *is* a standard rather than automatic certification. Sending notice to tens of thousands of employees, followed by further discovery and decertification motions, would be a waste of time and resources given the substantial record evidence that already contradicts Plaintiffs' claims.

Even if Plaintiffs could otherwise meet their burden to issue notice, which they cannot, individuals who signed arbitration agreements should be excluded. Plaintiffs' attempt to send notice to arbitration agreement signers is irreconcilable with Plaintiffs' earlier statements to this Court that those same individuals are "not part of the class" and are "going to go the route of arbitration." As the United States Supreme Court unequivocally confirmed in *Epic Systems Corporation v. Lewis*, the collective action waivers in Chase's arbitration agreements are enforceable. No. 16-285, 2018 WL 2292444 (U.S. May 21, 2018). Inviting arbitration agreement signers to join this collective action would contradict that decision and cause unnecessary confusion to the recipients.

For all of these reasons, Plaintiffs' motion should be denied. If, however, the Court is inclined to issue notice, Chase requests that the Court: (1) restrict notice to individuals who did

3

not execute an arbitration agreement and who worked as non-exempt Specialists in the Fraud Hotline Center of Chase's Katy Freeway Call Center, where the Plaintiffs with timely and non-arbitrable claims are almost exclusively located; and (2) order the parties to confer regarding the appropriate content and procedure for notice.

## II.   PROCEDURAL SUMMARY

Chase incorporates by reference the Procedural Summary presented in Plaintiffs' brief without admitting to the truth of Plaintiffs' allegations regarding alleged violations of any statute. Chase further adds that the parties have conducted depositions of six opt-in Plaintiffs, one supervisor from the Katy Freeway Call Center, and also attempted to conduct two additional depositions of opt-in Plaintiffs who failed to appear despite receiving notice.

## III.   ISSUES PRESENTED

The issue presented is whether the Court should authorize the issuance of class notice to tens of thousands of current and former employees working in over 300 Chase call centers nationwide. In particular, the Court is presented with determining:

(1) Whether Plaintiffs have carried their burden of demonstrating that these tens of thousands of individuals were all subject to a single, commonly applied and unlawful decision, policy, or plan;

(2) Whether Plaintiffs have carried their burden of proving that they are similarly situated to each of the other call center employees given the variations in job duties, log in procedures and practices, instructions from managers, and similar differences across the putative class;

(3) If certification is otherwise proper as to any part of the putative class, whether the notice should invite individuals to join the class who Plaintiffs have represented to this Court are "not part of this class" due to a binding arbitration agreement; and

4

(4) If certification is proper as to any part of the putative class, whether the proposed notice and form of notice proposed by Plaintiffs is appropriate.

## IV. BACKGROUND

**A.   Chase Operates Call Centers Across the Country, and They Conduct Different Business Operations Under Varying Circumstances With Uniquely Tailored Practices, Polices, and Procedures.**

Chase currently employs more than 21,000 non-exempt employees at more than 35 call center locations.[2] Within each division at each call center location, the non-exempt call center employees perform a myriad of different duties and report to hundreds of different Team Leads, Supervisors, and Division Leaders.

In fact, virtually every aspect of working as a non-exempt call center employee can vary based on a given individual's location, division, manager and personal practices. As set forth more fully below, some of these variations include: (1) whether each employee is expected to spend virtually all of her work day addressing calls or, like some putative class members, rarely, if ever, takes inbound calls; (2) the employee's practices for how and in what order she logs in to her telephone and computer; (3) whether the employee has ever been to be "call ready" at the start of her shift and, if so, whether the employee is paid for the time spent preparing for calls; (4) whether the employee's "adherence" to her schedule is tracked, and, if so, whether she has any trouble meeting her adherence while getting paid for all of her work time; and (5) whether the employee included time spent logging into their computer programs as time worked for which she was paid, as many report.[3] Significant differences in each of these categories span the entire group of

---

[2]   Rockwell App. 22 ¶ 2.
[3]   *See* Section #.# *infra.*

5

employees who work in Chase's call centers, including those who share the exact same Specialist

job titles as the Plaintiffs.[4]

**B.     Chase's Uniform Pay Policy Mandates That All "Call Center Employees" Record and Are Paid For Log In Time.**

There is only one relevant policy that applies to each of the call center employees:  Section

5.4 of Chase's U.S. Pay policy entitled "Reporting All Work-Related Activities" ("Pay Policy").[5]

Chase's Pay Policy is unequivocal:

**5.4.    Reporting All Work-Related Activities**

Overtime-eligible employees must record all time spent on work-related activities in the Time and Attendance System (TAS) so they are paid for that time. Employees are responsible for ensuring that time records are accurate.

An employee may not, for any reason, fail to report all of his or her work time in TAS. If an employee is asked or pressured to work without recording all of his or her work time or feel that he or she is being retaliated against for raising questions or concerns, the employee should immediately report this to the HR Business Partner, HR Support Group or the Code Reporting Hotline.

The following work-related activities must be recorded in TAS:

- Checking or sending work related emails
- Attending business meetings or required training sessions
- Looking at work-related intranet sites or doing administrative tasks
- Planning or making work-related telephone calls
- Logging into or out of phone systems, computer networks, or desktop applications

The Pay Policy not only requires employees to report all time worked, but even explicitly states

that time spent "Logging into or out of phone systems, computer networks, or desktop

applications" must be recorded. [6] Chase required all its non-exempt employees during the relevant

time period to electronically certify that their time is accurate each time that they submit time in

the Time and Attendance System ("TAS") in compliance with the requirements articulated above.[7]

---

[4]      *Id.*

[5]      Rockwell App. 22, Ex. A.   While Chase issues new policy manuals annually, the Chase Pay Policy did not change in any material way between 2013, the earliest possible part of the statutory period, and the present.  *See* Rockwell App. Ex. A–F.

[6]      The Pay Policy also requires employees to "immediately" report to Chase's HR Department or its Code Reporting Hotline any instance of being asked or pressured to work off the clock.  Rockwell App. 22 at Ex. A § 5.4.

[7]      Moore Dep. App. 23 at 57:21–58:2; Eaton Dep. App. 31 at 85:9–15.

C.   **The Vast Majority of the Call Center Employees Signed Binding Arbitration Agreements That Prohibit Them From Participating In This Case.**

Since June of 2009, all new Chase employees have signed Chase's Binding Arbitration Agreement ("BAA"); since 2014, there have been two different versions of the BAA .[8]  In all four versions, employees agree and acknowledge that all "Covered Claims" between the employees and Chase "shall be submitted to and resolved by final and binding arbitration in accordance with" the BAA.[9]  Covered Claims are then defined to include "all legally protected employment-related claims," including claims under the FLSA.[10]

All of the BAAs also contain a substantively-identical Class Action/Collective Action Waiver that states, in relevant part, as follows:

> All covered claims under this Agreement must be submitted on an individual basis.
> **No claims may be arbitrated on a class or collective basis** unless required by
> applicable law.  Covered Parties [which includes Chase and the signing employee]
> expressly waive any right with respect to any Covered Claims to submit, initiate,
> or participate in a representative capacity or as a plaintiff, claimant or member in a
> class action, collective action, or other representative or joint action, regardless of
> whether the action is filed in arbitration or in court.[11]

There are currently 77 individuals purporting to opt-in to this case, including Plaintiffs.[12] Of that group, 67 opt-in Plaintiffs have signed and agreed to be bound by a BAA that prohibits them from participating in this lawsuit and that requires them to bring their claims on an individual basis in arbitration.[13]  Moreover, the vast majority of the alleged putative class members have also

---

[8]      See Rockwell App. 22 ¶ 4; *id*. at Ex. G–H (all relevant versions of Chase's BAA).
[9]      *Id*.
[10]     *Id*.
[11]     *Id*. (emphasis in original).
[12]     *See* Doc. No. 48 at 1.
[13]     See Arbitration Agreements App. 24.  Additionally, two of the opt-in Plaintiffs entered into severance agreements in exchange for significant payments. *See, e.g.* Rockwell App. 22 Ex. I; Gunnoe Dep. App. 25, Ex. 3. These agreements uniformly include additional class waivers that preclude participation in a collective action or service as a class representative. *See id*.

signed a BAA.[14]   When asked about this issue by the Court, Plaintiffs' counsel admitted that the

individuals who signed arbitration agreements are not part of the class in this case:

> THE COURT:   There's no disagreement about that, people who signed the
> arbitration agreements are not part of the class?
>
> MR. ALEXANDER: That's correct, your Honor. [15]

## D.   Only Six Opt-in Plaintiffs Have Potential Claims In This Case.

Of the ten opt-in Plaintiffs who did not sign BAAs, only six have legally cognizable claims.

Bethany Dietch and Lakecia Morris should be dismissed from this case because they failed to

appear for their duly noticed depositions during the discovery period ordered by the Court—

nonappearances that were not disclosed to Chase until its counsel actually appeared for depositions

in Columbus, Ohio and Houston, Texas.[16]   Further, three opt-in plaintiffs — including one of the

two opt-in plaintiffs who failed to appear at deposition — have time-barred claims because they

were terminated more than three years before for their opt-in date: (1) Gregory Morton; (2) Ineasha

Day; and (3) Bethany Dietch.[17]   Thus, the Court is only presented with six opt-in plaintiffs who

even potentially remain eligible to participate in this action.

## V.   ARGUMENT

### A.   Given The Meaningful Standard For Conditional Certification, Numerous Courts Have Denied Certification Where, As Here, Individualized Issues Would Dominate The Litigation.

Plaintiffs must show that they are similarly situated to the employees to whom they seek

to send notice, and that the putative class members were the victims of a single unlawful decision,

---

[14]     See Rockwell App. 22 ¶ 4.
[15]     *See* Doc. No. 32, Excerpts from Transcript of Scheduling Conference, 5:13–15.
[16]     Deitch Dep. App. 27 at 1:14–6:12; Morris Dep. App. 28 at 3:1–4:21.
[17]     Rockwell App. 22 ¶ 5.

policy, or plan. *Novick v. Shipcom Wireless, Inc.*, No. 4:16-CV-0730, 2017 WL 1344961, at *4 (S.D. Tex. April 12, 2017). They can do neither.

Plaintiffs present this Court with a sprawling collective class made up of tens of thousands of employees with different managers, offices, divisions, job duties, and day-to-day circumstances – the vast majority of whom cannot participate in this litigation because of their arbitration agreements – and then urge the Court to treat conditional certification as essentially automatic. But "conditional certification is never automatic" and "showing that employees are similarly situated 'entails more than just a matching of job responsibilities as the requirement ensures that the collective action promotes efficient resolution of common issues of law and fact....'" *Novick*, 2017 WL 1344961, at *5.

Courts regularly refuse to permit FLSA suits to proceed as collective actions where individualized inquiries would eliminate "the economy of scale envisioned by the FLSA collective action procedure.[18]  Even at the conditional certification stage, the plaintiff must proffer "some identifiable facts or legal nexus [that] bind the claims so that hearing the cases together promotes judicial efficiency." *See Simmons v. T-Mobile USA, Inc.*, No. H-06-1820, 2007 WL 210008, at *6 (S.D. Tex. Jan. 24, 2007); *see also, e.g.*, *Caballero v. Kelly Servs., Inc.*, No. CV H-14-1828, 2015 WL 12732863, at *7 (S.D. Tex. Oct. 5, 2015) (reviewing evidence and denying conditional certification because "[r]esolution of the proposed class members' claims would require

---

[18]     *Clay v. Huntington Ingalls Inc.*, No. 09-7625, 2011 WL 13205917, at *3. (E.D. La. Sept. 29, 2011). Moreover, a "decision to certify, even if subject to correction at the decertification stage, is not without consequences' as '[t]oo much leniency at the notice stage can lead to a 'frivolous fishing expedition conducted by the plaintiff at the employer's expense.'" *Thomas v. Huntleigh USA Corp.*, No. H-16-3648, 2018 WL 560403, at *2 (S.D. Tex. Jan. 25, 2018) (internal quotation marks omitted). Put differently, "[t]o create a collective action class, including the cost associated with that when a Court is convinced that there is insufficient support for same prior to its certification would be an exercise in futility and wasted resources for all parties involved." *Basco v. Wal-Mart Stores, Inc.*, No. CIV.A. 00-3184, 2004 WL 1497709, at *5 (E.D. La. July 2, 2004).

individualized inquiries on essential factual issues," such as "the individual practices of each supervisor [and] each employee's time-keeping practices."); *Richardson v. Wells Fargo Bank, N.A.*, No. 4:11-CV-00738, 2012 WL 334038, at *4 (S.D. Tex. Feb. 2, 2012) (reviewing evidence and denying conditional certification of a "complex, enormous, nationwide class" because it was "clear that resolution of each Plaintiff's claim [would] require individualized inquiries about his or her specific managers' policies and practices.").

In determining whether certifying this case would promote judicial efficiencies, this Court should carefully consider the evidence proffered by both parties – which further underscores why certification is not warranted.[19] "Sometimes, as in the instant case, the parties will have engaged in discovery, perhaps limited or perhaps extensive, and so the standard for certification at the notice stage will be appropriately less lenient." *Clay* , at *3.

Indeed, another federal court has already denied an early-stage motion for certification in a case with nearly identical claims. In *Hart v. JPMorgan Chase Bank, N.A.*, the court denied conditional certification of a much less ambitious proposed class of 2,900 Chase call-center employees at 17 locations due to overwhelming variations between locations, supervisors, and individual practices. 2012 WL 6196035, at *5. Other courts similarly have denied conditional certification in cases involving alleged off-the-clock work at call centers. *See, e.g., Brooks v.*

---

[19]   Importantly, as part of this inquiry, the authority cautions that "Courts, like practicing attorneys, should refrain from stirring up unwarranted litigation*." Clay*, 2011 WL 13205917, at *4. Such concerns are particularly acute in the present case where Plaintiffs' counsel has prepared, without the Court's guidance, and sent, without the Court's approval, notice of this lawsuit through Facebook.com and potentially other means to an unknown number of putative class members. *See* Moll App. 29 ¶ 2. Plaintiffs' notice appropriates Chase's logo without permission and also does not contain a fraction of the information that would be required in a Court-authorized notice. In any event, given that Plaintiffs have already issued notice in this case without consulting with Chase or the Court, the Court should deny Plaintiffs' request to send additional notice to the putative class members.

*Bellsouth Telecomm., Inc.*, No. 1:07-CV-3054-ODE, 2009 WL 10699685, *8-9 (N.D. Ga. February 10, 2009); *Hawkins v. Alorica, Inc.*, 287 F.R.D. 431, 440 (S.D. Ind. 2012)

**B.      The Only Relevant Policy Directs Employees To Record Their Log-In Time.**

The only relevant policy applicable to all call center employees is Chase's Pay Policy. It mandates that all non-exempt Chase employees record all time spent on work-related activities, expressly including time spent "[l]ogging into or out of phone systems, computer networks, or desktop applications."[20]  *See* Exhibit B at § 5.4.  Plaintiffs allege that the written Pay Policy was subverted – in every one of Chase's call center locations for years on end – because call center employees were told to be "call ready" at the start of their shift to ensure strong "adherence" scores. *See* Doc. No. 48 at 6–16.  Plaintiffs cannot establish that any purported "call ready" policy: (1) uniformly applied to all putative class members; or (2) was unlawful.  Thus, Plaintiffs are not entitled to conditional certification.

Plaintiffs' supposed call readiness "policy" is based on alleged statements by ***individual*** supervisors that employees should arrive early to log in so that they could be call ready at the start of their shift.  *See* Doc. No. 48 at 10.  Even Plaintiffs, however, are not consistent on this point. For example, Plaintiff Gunnoe admits that other call center employees in her department who worked for other supervisors were not required to be call ready at the start of their shift.  Gunnoe Dep. App. 25 at 116:1–20.  Plaintiff Rivenbark admits that she was expressly told by Manager Andrea Foreman that Chase's policy prohibited employees from logging into their computer

---

[20]      Moreover, the Pay Policy states that each employee is responsible for recording and reporting their own time and are required to electronically certify that their time is accurate when it is submitted.  *See id.*; *see also* Rigsby Dep. App. 30 at 45:20–46–22; Eaton Dep. App. 31 at 94:5–13; Moore Dep. App. 23 at 57:21–58:2; Benjamin App. 13 ¶ 9; Guerra App. 14 ¶ 6; Thompson App. 32 ¶ 10.

programs before starting their shift.  Rivenbark Dep. App. 21 at 55:13–21.[21]  To the extent
Rivenbark alleges that team lead Dave Harrell instructed her to be "call ready" at her shift start,
Rivenbark Dep. App. 21 at 40:3–41:7, Jose Ramos-Balderas, another specialist working on her
team, said that "to my knowledge, Mr. Harrell never instructed anyone (including me) to come in
early so that they could start up their systems to be call ready right at shift time.  Valdez App. 46
¶ 7.  Numerous other call center employees attested: (1) they were never told that they needed to
be "call ready" at the beginning of their shift[22]; (2) they were instructed to, and did, begin their log
in process at shift start[23]; and/or (3) they were given "grace periods" after their shift started so that
they could log in before they took calls[24].  Plaintiffs' reliance on the concept of "adherence" scores
to establish a uniform policy or practice similarly fails.  Plaintiffs claim that call center employees
are forced to be call ready at their start in order to earn satisfactory adherence scores, but numerous
call center employees had no adherence expectations at all.

---

[21]     Andrea Foreman indicated that she recalled an instance "in 2016 when Shannon Rivenbark, the named
Plaintiff in this action, asked about coming in early to log into her computer and programs (without counting it as time
worked).  In response, I told Ms. Rivenbark that employees cannot do that; specialists, including Ms. Rivenbark,
should record any work-related activity as time worked, including coming early to log in, in accordance with Chase's
Pay Policy.  During this conversation, I offered to show Ms. Rivenbark Chase's Pay Policy.  Ms. Rivenbark refused
my offer." Foreman App. 33 ¶ 7.
[22]     Perez App. 3 ¶ 4; Garcia App. 34 ¶ 7; Benjamin App. 13 ¶ 6; Morgan App. 19 ¶ 3.; J. Cruz App. 5 ¶ 5;
Morgan App. 19 ¶ 3; Perez App. 3 ¶ 3; H. Cruz App. 2 ¶ 2; Johnston App. 5 ¶ 4; Polly App. 7 ¶ 2; Blevins App. 11 ¶
5.
[23]     Fuster ¶ 5; Perez ¶ 3.
[24]     Bokowy App. 4 ¶ 3.

| Areas of Variation | Declarant and Deponent Responses |
|---|---|
| Are you required to be ready to accept calls immediately upon the start of your shift (i.e., be "call ready")? | No.  Perez App. 3 ¶ 4; Garcia App. 34 ¶ 7; Benjamin App. 13 ¶ 6; Morgan App. 19 ¶ 3.; H. Cruz App. 2 ¶ 5; Morgan App. 19 ¶ 3; Perez App. 3 ¶ 3 (call ready whenever programs are loaded after shift starts); J. Cruz App. 5 ¶ 2 (do not take calls until after 15-minute huddle meeting); Johnston App. 5 ¶ 4 (huddle); Polly App. 7 ¶ 2 (huddle); Blevins App. 11 ¶ 5 (huddle).<br><br>Yes, call ready at start of shift. Rivenbark Dep. App. 21 at 40:11–15. |
| Is "adherence" measured as part of your performance? | No.  Sillah App. 9 ¶ 6; Fuster App. 8 ¶ 2; Bayless App. 35 ¶ 6; Foreman App. 33 ¶ 5 (adherence not measured for a year).<br><br>Yes.  Eaton Dep. App. 31 69:6–8; Galindez Doc. No. 48-16 ¶ 9. |
| Is "adherence" affected by technical issues? | No.  Macioce-Carver App. 10 ¶ 6 (had a special code for time spent on computer difficulties, which did not factor into her adherence score).<br><br>Yes.  Gunnoe Dep. App. at 25 79:10–13 (no code to enter when experiencing computer difficulties. |

Nor does the evidence support Plaintiffs' hypothesis that employees who are measured on adherence uniformly work off the clock, *See* Doc. No. 48 at 6.  In fact, many call center employees report that they have no trouble meeting their adherence expectations without working off the clock.  Macioce-Carver App. 10 ¶ 6; Runner App. 36 ¶ 3; Wolford App. 37 ¶ 5; Turner App. 38 ¶ 6; Flores App. 39 ¶ 5.

Plaintiffs also argue that the use of adherence metrics as a factor in determining manager bonuses encouraged managers to make call center employees work off-the-clock.  *See* Doc. No. 48 at 10.  As to managers, management bonus structures vary, and many managers are not measured on adherence at all.  Williams App. 40 ¶ 4; Velazquez App. 41 ¶ 7.  Even where managers are measured on adherence, it comprised a small amount – as little as 1% of their performance measurement. *See* Foreman App. 33 ¶¶ 6, 7 (only 1% of performance metrics); *see Carey v. 24 Hour Fitness USA, Inc.*, No. 2012 WL 4857562, at *2 (S.D. Tex. Oct. 11, 2012)

(holding that claims that manager bonus incentives cause violations necessarily requires an individualized inquiry into the conduct and motives of specific managers thus cutting against conditional certification).  Put simply, therefore, there is no nationwide adherence policy that compels or encourages employees to be call ready at the start of their shift.

If the Court grants conditional certification, it will be required to determine, for each individual, whether they were subject to any call readiness or adherence policies, and whether they had any difficulties meeting any adherence requirements without off the clock work. *See Simmons v. T-Mobile USA, Inc.*, No. H-06-1820, 2007 WL 210008, at *6 (S.D. Tex. Jan. 24, 2007) (denying conditional certification and finding that the defendant's policy of discouraging overtime yet requiring the putative class members to meet sales quotas does not "affect[] [putative class members] in different stores equally . . . .").  These issues simply cannot be addressed on a collective basis.

Moreover, even if Chase did have a uniform call readiness or adherence policy, neither is unlawful.  Those call center employees who did log in before their official start in order to be call ready attested that they got paid for that time.[25]  For this reason, numerous courts have held that similar adherence-like systems do not justify conditional certification. *See, e.g., Griffith v. Wells Fargo Bank, N.A.*, No. 4:11-CV-1440, 2012 WL 3985093, at *5 (S.D. Tex. Sept. 12, 2012) (denying conditional certification and finding that the experience of subjective "pressure" from efficiency policy did not warrant nationwide certification); *Anderson v. Wells Fargo Fin., Inc.*, No. 4:11-cv-00085, 2012 WL 12871958, *5 (S.D. Iowa Feb. 6, 2012) ("The Court cannot infer from the mere expectation that performance goals have to be met that an employer insists on

---

[25]     J. Cruz App. 5 ¶ 4 (allowed to log in up to 10 minutes before shift start); Fuentes App. 16 ¶ 5 (arrives pre-shift and starts working on the clock).

employees to perform unpaid overtime."). There is simply nothing unlawful about expecting employees to generally adhere to their set schedule, or to be call ready at their shift time provided their log-in time is compensated.

In sum, the supposedly uniform "call readiness" or adherence policy Plaintiffs describe does not exist; even if it did, there is nothing unlawful about call readiness or adherence.

**C.    Call Center Employees' Job Duties, Computer Log-In Processes, and Directives From Managers Are Varied and Will Require Individualized Inquiries**

Even if Plaintiffs could successfully prove that all call center employees were subject to a uniform unlawful policy – which they cannot – they are not similarly situated to each of the putative class members to whom they seek to send notice. There are material differences among the call center employees necessitating individualized determinations were the Court to try to adjudicate Plaintiffs' claims on a collective basis, including: whether each employee was paid for log in time, the job duties of those employees (as they relate to Plaintiffs' call readiness allegations), each employee's log in practices, and the instructions that each employee has received from their supervisors and trainers. This is the antithesis of a collective action.

First, the linchpin of Plaintiffs' motion is their allegation that each of the call center employees were never paid for computer log in time. *See* Doc. No. 48 at 6. In fact, numerous call center employees attest that they are, in fact, ***always*** compensated for their computer log in time. *See, e.g.,* J. Cruz App. 5 ¶7 ("I have always been paid for all hours that I work, including the time I spend logging into my computer at the beginning of the day); Johnston App. 5 ¶3; Polly App. 7 ¶ 3; Perez App. 3 ¶ 3; Fuster App. 8 ¶ 5; Sillah App. 9 ¶ 4; Macioce-Carver App. 10 ¶ 4; Blevins App. 11 ¶; 6 Rubenstein App. 12 ¶ 4; French App. 42 ¶ 6; Benjamin App. 13 ¶ 5; H. Cruz App. 2 ¶ 5; Guerra App. 14 ¶ 4; Robinson App. 17 ¶ 5; Turner App. 38 ¶ 3. ***This difference among the class members alone is sufficient to deny Plaintiffs' motion.***

Second, Plaintiffs unequivocally assert that call center employees "were required to interact with Chase customers over the phone" and "*did not* engage in any other type of work or service for Chase." *See* Doc. No. 48 at 13-14 (emphasis added). But the evidence — including Plaintiffs' own depositions — demonstrates that this allegation is simply false. Many putative class members did not routinely interact with Chase customers over the phone and, in fact, engaged in all kinds of other work such as document review, training, or communicating with customers via email.[26] Putative class members who were not taking inbound calls to start their shift could not have been subject to any type of call readiness policy. "[I]f the job duties among putative class members vary significantly, then class certification should be denied." *See Willis v. Behar*, No. 4:13-cv-3375, 2014 WL 12741911, at *9 (S.D. Tex. Dec. 12, 2014).

Third, Plaintiffs allege that "each Plaintiff and Putative Class Member ... followed the same log-in procedure" and had to arrive prior to their shift start time. *See* Doc. No. 48 at 7. The available evidence actually shows significant differences in the way putative class members start their work day — with variations in arrival times as compared to shift start times, log in procedures, log in times, and even whether they spend time getting coffee and greeting colleagues before starting their workday:

---

[26]     *See, e.g.,* Garcia App. 34 ¶ 2 ("I was a Development Center Coach (DCC) where I trained new hires and floated around the floor, assisting people with their calls. I did not receive my own calls in that position unless I wanted to work overtime as an analyst."); Sillah App. 9 ¶ 2 ("[M]y main job is not making or taking phone calls or assisting customers. Instead, I spend my days analyzing customer accounts for potentially illegal or fraudulent activity."); Fuentes App. 16 ¶ 2 ("Receiving inbound calls is only a small portion of what I do. Most of my day is spent writing emails to mortgage customers."); Robinson App. 17 ¶ 2 ("I spend very little time on the phone. There are some days where I handle as few as 2 or 3 phone calls. My time is spent reviewing documents and conducting research into transactions that are reported by Chase customers as fraudulent."); Runner App. 36 ¶ 2 (makes outbound calls); Bayless App. 35 ¶ 2 (reviews mortgage documents); Day Dec. App. 18 at 20:8–22:1 ("Loss mitigation you definitely have to do more work and more paperwork was involved. You had to find their debt to income ratio . . . I would say 60 [percent on the phone] and 40 [percent off the phone].").

16

| Areas of Variation | Declarant and Deponent Responses |
|---|---|
| What time do you typically arrive at your desk? | Can range between late, at the shift start time, or a few minutes before. Day Dep. App. 18 41:9–14 (late after shift start once a week due to childcare issues); Polly App. 7 ¶ 2 (right at shift start time); Morgan App. 19 ¶ 2 (same); Reyna App. 20 ¶ 2 (same); French App. 42 ¶ 3 (right at start tie or a few minutes late); Perez App. 3 ¶ 3 (a few minutes before shift start time).<br><br>15 to 20 minutes before shift.  Eaton Dep. App. 31 at 110:24–111:2. |
| What do you do when arrive at work? | Garcia App. 34 ¶ 4 (he arrives two minutes before shift start but notes that coworkers come earlier and hang out in the break room and "chit chat" and eat); Rubenstein App. 12 ¶ 4 (drop off personal belongings, chat with coworkers and use the restroom); Benjamin App. 13 ¶ 4 (coffee, snack, talk with coworkers); Robinson App. 17 ¶ 4 (sit in car);Bokowy App. 3 ¶ 5 (coffee); Sillah App. 9 ¶ 4 (coffee); Macioce-Carver App. 10 ¶ 4 (food); Reyna App. 20 ¶ 2 (breakfast). |
| What is your login process? | Log into phone and then log onto computer.  Fuster App. 8 ¶ 5; Bokowy App. 3 ¶ 6; Garcia App. 34 ¶ 5 ("I have always been instructed not to log into the computer until I logged into the phone); Fuentes App. 16 ¶ 4; Flores App. 39 ¶ 4; J. Cruz App. 5 ¶ 5; Robinson App. 17 ¶ 5; Runner App. 36 ¶ 4 (logs into phone, hangs up, boots up computer, and completes other tasks when necessary).<br><br>Log in to phone at beginning of shift, place phone in auxiliary, then log in to computer, then signal call ready.  Willis App. 43 ¶ 2; H. Cruz App. 2 ¶ 6; Morgan App. 19 ¶ 3; Reyna App. 20 ¶ 4.<br><br>Log into computer only.  Sillah App. 9 ¶ 4 ("Unlike other call center employees, I do not log into a phone system to track my time.").<br><br>Log in to computer, then log in to phone, immediately begin taking calls. Rigsby De9. App. 30 at 51: 16–23; 61:24–62:6; Rivenbark Dep. App. 21 at 45:11–46:3. |
| When do you log in to your computer? | Perez App. 3 ¶ 3 (right at shift start time); Guerra App. 14 ¶ 3 (same); Thompson ¶ 7 (same); Valdez App. 46 ¶ 5; Blevins App. 11 ¶ 4 (logs in pre-shift and records that as time worked); Payne App. 44 ¶ 3.<br><br>Varies.  Bayless ¶ 7 ("Chase allows employees in my department to log in to our computers and begin work before our scheduled shift or to start later than scheduled.  Chase does not appear to care about what time I start doing my work as long as I ultimately complete all of it.").<br><br>Rivenbark Dep. App. 21 at 45:12-18 (log in well before shift start time). |

| Areas of Variation | Declarant and Deponent Responses |
|---|---|
| How long does it take for you to log in to your computer?[27] | Thompson ¶ 8 (log-in time varied in different departments); Macioce-Carver ¶ 4 (1-2 minutes); J. Cruz ¶ 5 (2-3 minutes); Reyna App. 20 ¶ 3 (2-3 minutes) Guerra (2-3 minutes); Benjamin App. 13 ¶ 5 (2-5 minutes); Willis App. 43 ¶ 4 (3 minutes); Fuentes App. 16 ¶ 4 (3 minutes); Willis App. 43 ¶ 4 (same); Bokowy App. 3 ¶ 4 (3-4 minutes); Robinson App. 17 ¶ 5 (same); Payne App. 44 ¶ 4 (same); Perez ¶ 3 (5 minutes or less); Benjamin ¶ 5 (five minutes or less); Rigsby Dep. App. 30 at 62:13–17 (15 to 20 minutes); Rivenbark Dep. App. 21 at 84:18–85:3 (15 to 30 minutes). |
| What can affect log in time? | Garcia App. 34 ¶ 6 (number of systems/programs to load, new updates being installed, technical issues); Thompson App. 32 ¶ 8 (uses more programs than others, so log in takes longer). |
| Do you place your phone in "aux" or "auxillary" mode as part of your login process? | Would not place phone into aux mode at the start of the shift because it would negatively impact adherence score. Eaton Dep. App. 31 at117:11–14.<br><br>When shift begins and logs into telephone, phone automatically goes into Aux mode while programs load.  Morgan App. 19 ¶3; Valdez App. 46 ¶¶ 5–6.<br><br>Uses Aux code and time spent on an Aux code does not affect adherence. Blevins App. 11 ¶8; Payne App. 44 ¶ 4 (employees can use aux) |
| Do you have a delay between the start of your shift time and the time you start to take calls?[28] | Yes. Bokowy App. 3 ¶ 3; Morgan App. 19 ¶ 5 Foreman App. 33 ¶ 3 (shift for first specialists of the day starts 15 minutes before first calls); Ramos-Balderas App. 46¶¶ 5.<br><br>No.  See Doc. No. 48-34, Gray ¶¶ 5, 8 (have to be call ready at shift start). |
| What happens if you have technical difficulties during the login process? | Could enter code for technical difficulties or alert manager and it would not affect adherence.  Macioce-Carver App. 10 ¶ 6; Blevins App. 11 ¶ 8; Rubenstein App. 12 ¶ 5; Morgan App. 19 ¶ 5; Willis App. 43 ¶ 4<br><br>Phone did not have a setting for technical difficulties.  Gunnoe Dep. App. 25 at 111:16–21. |

---

[27]    The amount of time it takes putative class members to log-in will need to be determined for each class member for each day to determine if there is unpaid time and, if so, if that time is *de minimus.*
[28]    *See also* Valdez App. 45 ¶ 5 (5 minute buffer).

| Areas of Variation | Declarant and Deponent Responses |
|---|---|
| Do you ever record time before the start of your shift for log in activities? | Yes. J. Cruz App. 5 ¶ 5; Johnston App. 5 ¶ 2; Smith App. 15 ¶ 4 ("Although my shift starts at 7:00 a.m. and I log into the phone system at 6:55 a.m., I enter whatever time I got to my desk as my start time on my timesheet because that is when I did my first work-related task for the day: turning on my computer and loading my programs."); Bayless App. 35 ¶ 5; Fuentes App. 16 ¶ 5<br><br>No. Rivenbark Dep. App. 21 at 48:3–17. |

Plaintiffs' allegation that each class member followed the same log in procedures is simply false, and this Court will have to determine each class member's practices and how those practices affect whether they were compensated for computer log-in time.

Fouth, Plaintiffs cannot show that putative class members were uniformly trained or instructed regarding any so-called "call readiness" policy or, indeed, to work off the clock generally. In fact, putative class members attest that they received very different instructions than the Plaintiffs allegedly did from their individual trainers and managers:

| Areas of Variation | Declarant and Deponent Responses |
|---|---|
| Were you ever instructed to arrive prior to your shift start time? | No.  H. Cruz App. 2 ¶ 4 ("My supervisor has never told me that I need to come to work prior to my shift start time."). <br><br> Yes. Gunnoe Dep. App. 25 at 114:20–23; Hernandez Doc. No. 48-12 ¶ 7. |
| Were you ever instructed to log on to your computer prior to the start of your shift time? [29] | No. Willis App. 43 ¶ 7 ("In my eight years with Chase, nobody has ever asked me to work off the clock or to log-in to my computer before the start of my shift."); Polly App. 7 ¶ 2; Fuster App. 8 ¶ 4 ("My trainer instructed my class that we must first clock in from our telephones before we are allowed to log onto our computers."); Fuentes App. 16 ¶ 3; Benjamin App. 13 ¶ 3; H. Cruz App. 2 ¶ 5; Reyna App. 20 ¶ 3; Thompson App. 32 ¶ 7. <br><br> Yes. Gunnoe Dep. App. 25 at 37:22–38:6. |
| Were you ever instructed you had to be call ready at the start of your shift? | No. Wolford App. 37 ¶ 4 ("It is impossible for me to be ready to take calls at the start of the shift and that is not expected of me."); Perez App. 3 ¶ 4 ("None of my supervisors [she has had seven supervisors over ten years] have ever told me that I need to be able to start making or answering calls immediately after logging in.  In fact, supervisors have told me and others that we cannot log into our computer programs unless our shift has started and we are clocked in."); Robinson App. 17 ¶ 6 ("I have personally seen supervisors instruct employees not to use computers even for personal matters before the start of their shift to make sure they do not perform any work that is unpaid."); Garcia App. 34 ¶ 7 (In 17 years, "I have never been instructed to log into the computer and be "call ready" prior to the start of the shift"); Benjamin ¶ 6; Morgan ¶ 3; Willis App. 43 ¶ 3; Turner App. 38 ¶ 3. <br><br> Yes. Rivenbark Dep. App. 21 at 40:11–18. |
| Were you ever instructed that you would not be paid for time you spent logging in? | No.  Fuster App. 8 ¶ 3  ("The trainer instructed us that we get paid for any time spent on the computer and must record that time."). <br><br> Yes.  Rivenbark Dep. App. 21 at 48:3–23. |

---

[29]     Call center employees also differ as to whether they were instructed that they could place their phone in auxiliary mode while logging in to your computer.  *Compare* Willis App. 43 ¶ 2 (yes); Morgan App. 19 ¶ 3 (yes) *with* Eaton Dep. App. 31 at 117:11–14 (No).

| Areas of Variation | Declarant and Deponent Responses |
|---|---|
| Has your supervisor ever encouraged you to come to work early and log in off the clock? | No. H. Cruz App. 2 ¶ 7; Johnston App. 5 ¶ 6 ("I have never been asked to work off-the-clock, and I don't know why anyone would do so."); Garcia App. 34 ¶¶ 4–5; Polly App. 7 ¶ 3; Garcia App. 34 ¶ 10 ("I've never been instructed to work off the clock or to not properly record my time – quite the opposite!"); Thompson App. 32 ¶ 10 (five different supervisors and never been asked to work off the clock); Runner App. 36 ¶ 3 (managers have read timekeeping policies during meetings and some of the doors have the policy posted on them). <br><br> Yes. Gunnoe Dep. App. 25 at 113:18–114:23. |

Thus, putative class member were not only *doing* different things— but, if Plaintiffs are to be believed, they were being *told* different things about the rules and procedures they should follow.[30]

This testimony demonstrates that Plaintiffs have not and cannot show that all call-center employees perform the same or similar job duties (as they relate to inbound call taking), follow the same daily procedures as it relates to logging in to start their day, or were given identical instructions regarding call readiness and timekeeping as Plaintiffs allege.  Accordingly, Plaintiffs' Motion should be denied.

3.    Plaintiffs' Cited Authority Does Not Support Conditional Certification In This Case.

Plaintiffs' comparison of this case to others in which courts have granted conditional certification is misguided.  In fact, the cases Plaintiffs cite are readily distinguishable and offer little support to their cause.

---

[30]    *Caballero v. Kelly Servs., Inc.*, No. CV H-14-1828, 2015 WL 12732863, at *7 (S.D. Tex. Oct. 5, 2015) (refusing certification due to individualized issues including "the individual practices of each supervisor, the communications of each supervisor with Defendant's management regarding overtime practices, the effect of each supervisor's individual practices on the hours worked by each employee, and each employee's time-keeping practices"); *Long v. BDP Intern., Inc.*, No. 4:12-1446, 2013 WL 505232, at *5 (S.D. Tex. Feb. 8, 2013) ("Evidence of individual managers requiring employees to work overtime and discouraging reporting of that overtime is insufficient to establish a national, company-wide policy.").

Plaintiffs rely chiefly on two inapposite cases: *Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528 (S.D. Tex. 2008) and *Burch v. Qwest Comm. Int'l Inc.*, 500 F. Supp. 2d 1181 (D. Minn. 2007). *See* Doc. No. 48 at 15. In *Falcon*, the class was made up exclusively of employees holding one job title, and multiple global policies directly encouraged managers committing FLSA violations. 580 F. Supp. 2d at 536. Subsequent decisions have made clear that both the single job title at issue and the uniform policies discouraging overtime, neither of which exist here, were essential to the *Falcon* court's ruling. *See Richardson v. Wells Fargo Bank, N.A.*, No. 4:11-CV-00738, 2012 WL 334038, at *4 (S.D. Tex. Feb. 2, 2012) (distinguishing *Falcon* on the basis that "plaintiffs produced that the defendant strongly discouraged overtime by failing, for example, to increase labor budgets even after reclassifying plaintiffs from "exempt" to "non-exempt" status, despite "anticipat[ing] that [plaintiffs] would continue to work more than 40 hours after the reclassification.").

Likewise, the *Burch* decision has no application here. As subsequent courts have recognized, certification was possible in *Burch* because the defendant did not present any conflicting evidence to controvert the allegedly unlawful policy or the allegation that it was applied company-wide. *See Hawkins v. Alorica, Inc.*, 287 F.R.D. 431, 440 (S.D. Ind. 2012). Here, Chase has offered substantial evidence on both points. *See supra* Sections # and #. As a result, Plaintiffs' reliance on *Burch* is misplaced.

Plaintiffs' remaining citations to other conditional certification grants—in all instances without substantive elaboration—are distinguishable on similar grounds. *See* Doc. No. 48 at 16–18. Several of these cases involved limited locations and small classes completely unlike the sweeping putative class requested in Plaintiff's Motion. *See Fischer v. Mich. Bell Tele. Co.*, 665 F. Supp. 2d 819, 822 (E.D. Mich. Oct. 22, 2009) (six locations in a single state); *Kucher v. Domino's Pizza, Inc.*, No. 16-cv-2492, 2017 WL 2987214 (S.D.N.Y. Feb. 13, 2017) (limited to

locations in two states where single franchisee uniformly controlled "all aspects of operational policy" across his locations); *Russell v. Il. Bell Tel. Co.*, 575 F. Supp. 2d 930 (N.D. Ill. 2008) (limited to four locations); *Ware v. T-Mobile USA*, 828 F. Supp. 2d 948 (M.D. Tenn. 2011) (denying nationwide notice).[31]

Plaintiffs' citation to *Bishop v. AT&T Corp.* similarly cuts against their Motion. 256 F.R.D. 503 (W.D. Pa. 2009). In *Bishop*, the plaintiffs presented evidence of an undisputed uniform requirement to complete computer login before completing phone login and, further, a uniform requirement to track compensable time by phone login. 256 F.R.D. 503, 505 (W.D. Pa. 2009). Here, the available evidence shows substantial variation as to the order of log in and contradicts Plaintiffs' claims that employees were uniformly denied compensation for that log-in time. Instead, Chase employees were explicitly instructed to report computer log in time and any variations from that policy would constitute local deviations that must be assessed on an individualized basis.

## C.   Alternatively, the Court Should Authorize Notice to Only Putative Class Members Who Worked in the FHC at the Katy Call Center.

For all the reasons above, Plaintiffs have failed to show that notice should issue to any group of putative class members. Nonetheless, if the Court is inclined to authorize any notice, it should limit such notice to putative class members who worked in the FHC at the Katy Call Center – the group in which nearly all the opt-ins with potentially timely claims worked.[32] The Court has

---

[31]   Other cases cited by Plaintiffs involve analysis of allegedly unlawful pay systems or exemption misclassification, rather than the complexities of the pre-shift time at issue in this case. *See Rosas v. Dark Star Prod. Testing, Inc.*, No. 2:16-cv-00140, ECF No. 19 (S.D. Tex. Jul. 31, 2017) (misclassification due to day rate payment system); *Edwards v. KB Home*, No. 3:11-cv-00240, ECF No. 69 (S.D. Tex. Sept. 25, 2012) (misclassification of single job title).

[32]   The testimony of Plaintiff Denise Gunnoe forecloses any claim that her work site in Irving, Texas should be included in the putative class. Specifically, Gunnoe testified that she personally observed that the early log-in that allegedly applied to her was not actually required, practices varied from supervisor-to-supervisor, and half if not more

discretion to limit the scope of any proposed class based on application of the "similarly situated" analysis mandated by 29 U.S.C. § 216. *See Villarreal v. St. Luke's Episcopal Hosp.*, 751 F. Supp. 2d 902, 918-19 (S.D. Tex. 2010) (citing *Baldridge v. SBC Commc'ns, Inc.*, 404 F.3d 930, 931–32 (5th Cir. 2005). In situations where courts find that only a portion of the proposed class is similarly situated, they routinely exclude all non-similarly situated individuals from receiving notice and limit notice to a particular work group or location. *See id.*

Here, even within the FHC at the Katy Call Center, material differences between the call center employee practices and procedures preclude conditional certification. For example, Lead Plaintiff Rivenbark admitted that if call center employees had log in procedures or managerial instructions that varied from hers, they would be "entirely different" from her on the very issues that are central to the adjudication of Plaintiffs' claims. Not only do class members nationwide differ from Rivenbark, *see supra* Section ___, but the testimony of several other Katy Call Center employees reveals that they are "entirely different" from her as well:

---

of the people in her work area routinely arrived at or after their scheduled start time to begin logging in. Gunnoe Dep. App. 25 at 116:1–117:18. She even admitted that "younger employees" routinely "only" show up at scheduled start times without any consequences. Gunnoe Dep. App. 25 at 116:11–117:7. Thus, according to Plaintiffs' own testimony, notice should not issue to Plaintiffs in the Irving, Texas call center.

| Rivenbark Testimony | Other Katy Call Center FHC Employees |
|---|---|
| Q.   So if a call center specialist said that they did not perform any work before their shift time, including logging in to their computer.   They didn't do a thing work related until their shift start time, that would be different than the practice that you had?<br><br>A.   That would be different.<br><br>Rivenbark Dep. App. 21 at 127:23-128:5 | Willis App. 43 ¶ 3 (over 8 years and 8 managers, "I have never been told by anyone at Chase that I must be ready to take a call at the start of my shift. I am also not aware of any Specialists who log-in to their computers before the start of their assigned shifts in order to take a call right at the beginning of their shifts.   I believe that this would be a violation of Chase's policy prohibiting employees from working off the clock.")<br><br>Morgan App. 19 ¶¶ 2, 3 (logs in at, not before, shift start time and then begins working; usually gets to her desk at or near shift start time).<br><br>Valdez App. 46 ¶ 5 ("I was expected to punch into my phone at my shift time.") |
| Q:   And so, somebody who says that they were paid for their log in time, that would different from your experience at Chase, correct?<br><br>A:   It would be.  I don't know anybody, who ever [sic] did not sign in to their computer before their shift began.<br><br>Rivenbark Dep. App. 21 at 128:6-13 | Willis App. 43 ¶ 4 ("I am paid for all of the time that I spend logging-in to my computer.).<br><br>Morgan App. 19 ¶¶ 3, 8 (has "always been paid" for computer log in time and does not log into computer until after her shift begins and after she logs into her phone); Valdez App. 46 ¶¶ 5–6 (logged into computer after shift began; "I was never trained or told to come in early and log into my computer and programs in order to be 'call-ready' right at the start of my shift."). |
| Q:   So if a call center specialist said that they were in the practice of including the time that it took them to log in to the computer in the time worked that they put into the [timekeeping system], that would be entirely different from your practice at Chase?<br><br>A:  Absolutely.<br><br>Rivenbark Dep. App. 21 at 129:1-7 | Morgan App. 19 ¶  8 ("When entering my time, I always include the time that it takes me to log in to my computer each day…")<br><br>Willis App. 43 ¶¶ 4, 6 (enters his time each day and has always been paid for computer log in time). |

Even within the Katy FHC there are differences precluding certification, but if the Court is inclined

to issue any notice whatsoever it should be limited to individuals working the Katy FHC.

**D.    The Court Should Not Authorize Notice to Putative Collective Class Members Who Signed a BAA and, Thus, Cannot Participate In This Action.**

Plaintiff is not similarly situated to any of the thousands of alleged collective class members who contractually agreed to submit any claims arising under the FLSA to arbitration on an individual basis and waived any right to participate in a class or collective action such as the present lawsuit.  If individuals who are bound by the BAA's collective action waiver receive Plaintiffs' proposed notice, they will inaccurately be told that they are "eligible" to join this lawsuit. *See Botello v. COI Telecom LLC*, 2010 WL 5464824, at *7 (W.D. Tex. Dec. 30, 2010) (holding that plaintiffs were "not similarly situated to the proposed class members" because "many of the proposed members of the 'class' will have their claims subject to their arbitration agreements").[33]    Indeed, Plaintiffs rightfully concede that arbitration agreement signers are precluded from participating in this lawsuit, confirming on the record at the initial scheduling conference that "[t]here's no disagreement" among the parties "that, people who signed the arbitration agreements are not part of the class" and that "those folks are going to go the route of arbitration."[34]    Plaintiffs have now changed course, arguing that notice of an opportunity to participate in this collective action should be sent to those same individuals. *See* Doc. No. 48 at 20.          .

Plaintiffs' request should be denied because: (1) the United States Supreme Court's recent holding in *Epic Syst. Corp. v. Lewis*, 2018 WL 2292444 (2018) prohibits courts from supplanting the parties' "chosen arbitration procedures" with those of other federal statutes, including the FLSA; (2) the BAAs each contain a clause that delegates to the arbitrator the right to determine

---

[33]    *See also Odem v. Centex Homes*, 2010 WL 424216, at * 5 (N.D. Tex. Feb. 4, 2010) (citing the individualized defense of whether putative plaintiffs signed arbitration agreements as a reason for denying class certification); *Fischer v. Kmart Corp.*, No. CIV. 13-4116, 2014 WL 3817368, at *7 (D.N.J. Aug. 4, 2014) (denying conditional certification as to those opt-in plaintiffs who consented to an arbitration agreement with a collective action waiver because they were "prevented from joining this collective action . . . and are also not similarly situated to members who can arbitrate in a collective action"); *Adami v. Cardo Windows, Inc.*, 299 F.R.D. 68, 81-82 (D.N.J. 2014) (holding that the named plaintiffs were not similarly situated to employees who had signed mandatory arbitration agreements and lacked standing to contest the validity of these agreements).

[34]    *See* Doc. No. 32, Excerpts from Transcript of Scheduling Conference, 5:13–15.

issues of arbitrability; thus, there is no legal issue for the Court to decide with respect to the BAAs; and (3) notwithstanding the BAAs' delegation clause, determining the enforceability of each BAA would require the application of myriad state laws and require individual analyses of each agreement, making collective treatment improper.  Each of these is an independent basis for declining to issue notice to arbitration agreement signers.

      1.      The Supreme Court's Holding In *Epic Sys. Corp.* Forecloses Plaintiffs' Request To Send Notice Of This Lawsuit To Individuals Who Have Agreed To Arbitrate Their Claims On An Individual Basis.

As the United States Supreme Court recently confirmed in *Epic Sys. Corp.*, courts must honor valid agreements to arbitrate that include a waiver of the ability to participate in class or collective action proceedings, and must "respect and enforce the parties' chosen arbitration procedures."  2018 WL 2292444, at *3, 5 (". . . Congress has instructed federal courts to enforce arbitration agreements according to their terms—***including terms providing for individualized proceedings***.") (emphasis added).  In light of this principle, the Supreme Court reaffirmed its holding from "decades ago that an identical collective action scheme (in fact, one borrowed from the FLSA) does *not* displace the Arbitration Act or prohibit individualized arbitration proceedings." *See id.* at *10.

The Supreme Court has expressly directed that individuals who have agreed to binding arbitration with a collective action waiver, as here, *must* be excluded from this litigation.  This case cannot supplant the "parties' chosen arbitration procedures" and notice would not serve any valid purpose under the FLSA. *See Medina v. Alicia's Mexican Grille Inc.*, 2016 WL 3226170, at *5 (S.D. Tex. June 13, 2016) ("[C]ourts often consider policies of judicial economy and avoidance of 'stirring up' of litigation through unwarranted solicitation as balanced against the remedial policy of the FLSA.") (internal quotes omitted).  The Court therefore should deny Plaintiffs' request to send notice to anyone who is bound by a BAA.

2.     The Employees And Chase Agreed To Delegate The Exclusive Right To <u>Determine</u> The Enforceability Of The BAA To An Arbitrator.

In addition to the enforceable collective action waivers, each BAA also contains a delegation clause that states:

> Any claim as to the arbitrability of a particular issue or claim pursuant to [the BAA] is to be resolved in arbitration.

*See* Rockwell App. 22 ¶ 4; id. at Ex. G–H.   Thus, were any individual to have a dispute as to the arbitrability of the FLSA claims at issue, an arbitrator – and not this Court – must resolve that dispute in the first instance.   *See Reyna v. Int'l Bank of Commerce*, 893 F.3d 373, 379 (5th Cir. 2016) ("Because the arbitration agreement contains a delegation clause, any disputes as to arbitrability of [the plaintiff's] claim or the scope of the arbitration agreement must be decided by the arbitrator, not the courts.").   Consequently, to the extent Plaintiffs contend that notice notwithstanding the BAA would allow those individuals to challenge the arbitrability of their claims before this Court, such notice would still be improper because the BAA expressly prohibits challenges to arbitrability in this forum.

3.     BAA Signers Are Not Similarly Situated To Each Other.

Even if the Court were to ignore the delegation clause in the BAA – which would be improper – determining arbitrability would require this Court to potentially assess thousands of individualized contract defenses under the laws of numerous different states.   *Morangelli v. Chemed Corp.*, 2010 U.S. Dist. LEXIS 146149 (E.D.N.Y. June 17, 2010) ("It would be a disservice to judicial efficiency to certify all [employees], when those with arbitration agreements are subject to additional, prolonging motion practice which will likely disqualify them from the case."); *see also Hudgins v. Total Quality Logistics, LLC*, No. 16 C 7331, 2017 WL 514191, at *4 (N.D. Ill. Feb. 8, 2017) (limiting notice to only those potential members who have not signed arbitration agreements because "[i]t does not make sense to notify [5,100 out of 5,800 potential class members who have signed arbitration agreements] about a lawsuit that they almost certainly are unable to

join; this would constitute a waste of resources and would risk misleading those individuals into thinking they will be able to join the lawsuit"). Rather than create a mechanism for similarly situated individuals to efficiently adjudicate their claims, as the FLSA intends, notice to individuals who are bound by the BAA would supplant Plaintiffs' wage and hour claims with individualized mini-trials about the enforceability of thousands of agreements under myriad state laws.[35]

## VI.    OBJECTIONS TO PROPOSED NOTICE

If the Court were to grant conditional certification to anyone in this case, which it should not, the Court should reject Plaintiffs' overbroad and erroneous proposed notice. Chase respectfully requests that the Court instead direct the parties to submit a mutually agreeable notice within 30 days of such an Order, or to submit separate proposals to the Court if the parties cannot agree on one. *See, e.g., Davis v. Mostyn Law Firm, P.C.*, No. 4:11-CV-02874, 2012 WL 163941, at *11 (S.D. Tex. Jan. 19, 2012) (ordering "parties to meet and confer regarding the content of the notice and consent form and to submit a joint proposed form").

Among the examples of overreach and errors:

- Plaintiffs confusingly identify the wrong employer to putative class members – both because the notice identifies JPMorgan Chase & Co. as the employer when putative class members were actually employed by JPMorgan Chase Bank, N.A., and because Plaintiffs elsewhere in the notice refer to "Republic" as the employer, presumably because the proposed notice has been adapted from an unrelated action against another employer;

- Plaintiffs unnecessarily demand that Chase physically post notice in any location where currently employed putative class members work;[36]

---

[35] The cases cited by Plaintiffs (Doc. No. 48 at 17–18) are inapposite here, both because: (1) they all pre-date the Supreme Court's decision in *Epic*, discussed *supra*, which makes clear that the FAA "protect[s] pretty absolutely" the parties' expressed "intention to use individualized rather than . . . collective action procedures;" and (2) those cases hold that notice may be appropriate in circumstances where the arbitrability of the underlying claims is unclear (for example, where no motion to compel has yet been filed). That is not the case here, however, where the Court will never need to adjudicate any issues relating to arbitrability both because: Plaintiffs have already conceded that the putative collective action members here who have signed BAAs "are going to go the route of arbitration;" and because the BAA delegates such decisions to an arbitrator.

[36] Requiring posting within the workplace is both unnecessary and inappropriate because it is simultaneously under- and over-inclusive. Putative class members who are no longer employed would never see a posted notice and currently employed putative class members would have already received notice by mail. *See In re Wells Fargo Wage*

- Plaintiffs request that they directly receive employees' private information rather than for Chase to send that information to a third-party administrator, which is a commonly used procedure for the facilitation of court-ordered notice to ensure, *inter alia*, the protection of private information.  *See Davida v. Newpark Drilling Fluids, LLC*, SA-14-CA-552-HJB, 2015 WL 13652730, at *4 (W.D. Tex. Jan. 6, 2015) (ordering a neutral third-party administrator to distribute notice); *In re Am. Family Mut. Ins. Co. Overtime Pay Litig.*, MDL Docket No. 1743, 2009 WL 248677, at *4 (D. Colo. Feb. 3, 2009) (finding third-party administrator appropriate "to protect the integrity of the process");[37]

- Plaintiffs request that they receive each putative class members' (1) drivers' license numbers, (2) phone numbers, (3) dates of birth, (4) email addresses; and (5) social security numbers.  This information is unnecessary as part of any notice process.  "[T]here is no reason to produce more than the name, last known mailing address, and dates of employment for each putative collection member at the notice stage."[38]  *Ridley v. Regency Vill., Inc.*, No. CV H-17-974, 2018 WL 1334813, at *9 (S.D. Tex. Mar. 15, 2018) (internal quotation omitted).  Sending notice by email address is especially problematic because "allowing notice via email increases the risk of distorting the court-approved notice, since it is easily altered and forwarded to unintended recipients."  *In re Wells Fargo Wage & Hour Employment Practices Litig. (No. III)*, No. H-11-2266, 2013 WL 2180014, at *2 (S.D. Tex. May 17, 2013) (finding "the provision of email addresses will likely not facilitate notice").

As the above demonstrates, Plaintiffs' proposed notice to putative class members and procedure for issuing notice is unfit for this Court's approval.  If any notice should issue to putative class members, and none should, the Court should require a good faith attempt by the parties to reach mutually agreeable content and procedure for the notice.

---

*& Hour Employment Practices Litig. (No. III)*, No. 11-2266, 2013 WL 2180014, at *2 (S.D. Tex. May 17, 2013) ("[P]ostings [only reaching current employees] would thus merely be supplemental to the mailed notice and are therefore overly intrusive."); *Lewis v. Huntington Nat. Bank*, No. 11-0058, 2011 WL 8960489, at *3 (S.D. Ohio June 20, 2011) ("[C]ourts have generally approved only a single method for notification unless there is a reason to believe that method will be inadequate."); *Shajan v. Barolo, Ltd.*, No. 10-1385, 2010 WL 2218095, at *2 (S.D.N.Y. June 2, 2010) ("[S]ince all current employees will be receiving the notice, there is no need to require defendants to post the notice in the workplace.").

[37]     Plaintiffs' own proposed notice states that the putative class members' private information will be kept confidential, a concession of the importance of confidentiality. *See* Doc. No. 48-49 at 5.

[38]     Plaintiffs also request the social security numbers of putative class members, which is also inappropriate given obvious privacy concerns. *See Hens v. ClientLogic Operating Corp.*, No. 05-CV-381S, 2006 WL 2795620, at *5 (W.D.N.Y. Sept. 26, 2006); *Fasanelli v. Heartland Brewery, Inc.*, 516 F. Supp. 2d 317, 324 (S.D.N.Y. 2007); *Delgado v. Ortho-McNeil, Inc.*, No. SACV07-263CJCMLGX, 2007 WL 2847238, at *3 (C.D. Cal. Aug. 7, 2007); *Sharer v. Tandberg, Inc.*, No. 1:06CV626 JCC, 2006 WL 2988104, at *3 (E.D. Va. Oct. 17, 2006).

## VII.   CONCLUSION

Defendant respectfully requests that the Court deny Plaintiffs' Motion.  Alternatively, if the Court were to authorize notice, it should be limited to those individuals in the Katy FHC who did not agree to arbitrate their claims.

Dated:  June 8, 2018

Respectfully submitted,

/s/ Stefanie R. Moll
Stefanie R. Moll (Attorney-in-Charge)
TX Bar No. 24002870
Fed ID No. 22861
stefanie.moll@morganlewis.com
1000 Louisiana Street, Suite 4000
Houston, TX  77002
T:  713.890.5000
F:  713.890.5001

ATTORNEYS FOR DEFENDANT
JPMORGAN CHASE & CO.

OF COUNSEL:

Carrie A. Gonell (admitted *pro hac vice*)
CA Bar No. 257163
carrie.gonell@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
600 Blvd., Suite 1800
Costa Mesa, California 92626
T:  714.830.0600
F:  714.830.0700

T. Cullen Wallace
TX Bar No. 24072412
Fed ID No. 1383060
cullen.wallace@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX  77002
T:  713.890.5000
F:  713.890.5001

Aimee M. Raimer
TX Bar No. 24081275
Fed ID No. 24081275
aimee.raimer@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, TX  75201
T:  214.466.4000
F:  214.466.4001

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of June 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Clif Alexander
Austin W. Anderson
Lauren E. Braddy
ANDERSON2X, PLLC
819 N. Upper Broadway
Corpus Christi, Texas 78401

ATTORNEYS FOR PLAINTIFF

/s/ Stefanie R. Moll
Stefanie R. Moll